**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

HALPERNS' STEAK AND SEAFOOD COMPANY, LLC,

Plaintiff,

v

JOSEPH HOFFMAN,

Defendant.

Case No. 1:26-cv-3294

Honorable

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

Halperns' Steak and Seafood Company, LLC ("Halperns'") states its Complaint against Joseph Hoffman ("Hoffman") as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Halperns' is a Georgia limited liability company.

2. Halperns' sole member is Centurion Business Group, LLC ("Centurion").

3. Centurion is a Delaware limited liability company.

4. Centurion's sole member is GFS US Holdings, LLC, a Michigan limited liability company.

5. GFS US Holdings, LLC's sole member is GFS Holding Inc., a Delaware corporation with its principal place of business in Kent County, Michigan.

6. Halperns' is a citizen of Delaware and Michigan.

7. A former employee of Halperns', Hoffman is an individual residing in Texas.

8. Because Halperns' is a citizen of Delaware and Michigan and Hoffman is a citizen of Texas, there is complete diversity among the parties.

9. The amount in controversy between the parties, including the value of the object of the litigation, exceeds $75,000.

10. Because there is complete diversity among the parties and the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction under 28 U.S.C. § 1332.

11. This Court has personal jurisdiction over the parties pursuant to their consent under Section 11 of the Protective Agreement between Halperns' and Hoffman (the "Protective Agreement"). (**Exhibit A**, Protective Agreement.)

12. Forum and venue are appropriate before this Court pursuant to Section 11 of the Protective Agreement. (Exhibit A.)

## General Allegations

13. Halperns' incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

14. Halperns' is a premium meat and seafood processor and distributor with operations throughout the eastern half of the United States, including in Texas.

15. The protein processing and distribution industry is highly competitive. A company's success depends heavily on its business strategy, which is based in large part on the confidential information it develops and implements.

16. If a competitor in the protein processing and distribution industry obtained a company's business strategies or other confidential information, that competitor could easily use the information to compete unfairly with the company.

17. For these reasons, companies in the protein processing and distribution industry take strong precautions to protect their confidential information, including, among other things, requiring their employees to sign confidentiality, non-solicitation, and non-compete agreements that apply after employment ends.

18. Hoffman worked as Halperns' Director of Operations from September 2019 to October 2023.

19. Hoffman worked as Halperns' Interim General Manager for its Kalamazoo, Michigan, facility from October 2023 to March 2024.

20. Hoffman worked as Halperns' General Manager for its Texas Division March 2024 to August 2025.

21. While working as General Manager for Halperns' Texas Division, Hoffman became Interim Vice President of Operations in April 2025.

22. Hoffman worked as Halperns' Vice President of Operations from August 2025 until his termination in August 2026.

23. As Halperns' General Manager for its Texas Division, Hoffman led and managed the strategic vision of the Texas Division. Among other things, he developed and maintained the Division's Annual Operating Plan in alignment with division and corporate objectives; adjusted that plan based on market conditions; participated in corporate Long Range Planning by providing market trends and opportunities; led the Division's sales function by participating in key customer interactions; and provided support and direction on finance, human resources, warehousing, transportation, and marketing, including identifying opportunities to enhance margin and drive product mix. He also hired, trained, supervised, and evaluated the Division's staff and supervisors.

24. Beginning on April 13, 2025, Hoffman served as Halperns' Interim Vice President of Operations while continuing to serve as General Manager of its Texas Division.

25. On August 3, 2025, Hoffman moved beyond the interim position and became Halperns' Vice President of Operations.

26. As Interim Vice President of Operations and later as Vice President of Operations, Hoffman led and managed the operational strategic vision for all of Halperns' facilities. Among other things, he developed, oversaw, managed, and communicated Halperns' Annual Operating Plan, including targets for growth, operating expenses, and earnings; led the operations side of the business, including problem solving and decisions on approach, process, and methodology; overseeing the development, implementation, and management of all Standard Operating Procedures used in the operations of the business; inventory management from intake, warehousing, and processing; provided overall leadership for the division General Managers and for the procurement and merchandising; guided and measured manufacturing processes and performance; participated in corporate Long Range Planning by providing market trends and opportunities; worked with the Vice President of Sales to support sales strategy and ensure the provision of excellent customer service, and understanding and providing support and direction on sales, finance, human resources, warehousing, transportation and marketing issues for the entire Halperns' business.

27. While serving as the General Manager of the Texas Division and the Vice President of Operations, Hoffman worked out of Halperns' Arlington, Texas facility.

28. As Halperns' General Manager of the Texas Division and as its Vice President of Operations, Hoffman was intimately familiar with Halperns' confidential information and trade secrets. That information includes, among other things, Halperns' Annual Operating Plans and Long Range Plans; business plans and strategies; financial results, budgets, and forecasts, including sales, margin, expense, and earnings data; costs, pricing and incentive strategies, pricing margins, and discount strategies; marketing and product information; customer identities, preferences, needs, expectations, and contracts; prospective customers, pipelines, and leads; sales

histories and sales data by product, customer, and territory; sales and delivery schedules; credit terms and invoicing and payment records; procurement strategies and agreements and arrangements with suppliers and vendors; warehousing, transportation, and production processes and performance metrics; and personnel information, including staffing, compensation, and succession planning. Indeed, at his level of leadership, Hoffman had access to and used Halperns' most sensitive and proprietary information.

29. As a leader at Halperns', Hoffman was eligible to participate in a Long-Term Incentive Plan (the "LTIP").

30. In connection with the LTIP, and to protect the confidential information and relationships that employees such as Hoffman accessed and developed while at Halperns', Halperns' required those employees to enter into protective agreements like Hoffman's. (Exhibit A.)

31. Hoffman executed the Protective Agreement on March 18, 2024. (Exhibit A.)

32. Among other things, the Protective Agreement provided that:

> a. You agree that because of Company's legitimate business interests, during your employment with Company and for a period of two (2) years after your employment with Company ends for any reason, you agree you will not:
>
> > i. be employed by, perform services for, or have an ownership interest in, any entity that offers products or services in competition with any products or services offered by Company, wherever Company offers those products or services, if doing so would require, or foreseeably allow or result in, any use or disclosure of Confidential Information (as defined above) that you obtained in the course of your employment with Company; and/or
> >
> > ii. engage in Prohibited Activity within the geographic territory in which you had direct control, managerial or supervisory responsibility during the two (2) years

> preceding the termination of your employment with Company. For purposes of this Agreement, **"Prohibited Activity"** is any activity on behalf of yourself or other person or entity in which you perform the same or similar responsibilities that you performed for Company in connection with the same or similar business as Company's business during the two (2) years preceding the termination of your employment with Company.
>
> b. For purposes of this Section and without limitation as to other competitors, Company considers Sysco, US Foods, Ben E. Keith, Performance Food Group, Reinhart, and Food Services of America as its primary, but not exclusive, distribution competitors; it also considers Restaurant Depot, Costco, and Sam's Club as its primary, but not exclusive, retail competitors.

(Exhibit A, § 6(a)-(b).)

33. Section 8 of the Protective Agreement also provided that:

> You may also be subject to additional restrictions if you are eligible for and subject to the Company's Long-Term Incentive Plan, and the terms of such plan are incorporated herein.

(*Id.*)

34. On March 18, 2024, Hoffman opted to participate in the LTIP and signed the associated Award Agreement (the "Award Agreement"). (**Exhibit B,** LTIP Award Agreement.)

35. Halperns' is a Related Employer under the Award Agreement.

36. Section 5(f) of the Award Agreement provides that "for purposes of this Section 5, 'Plan Sponsor' includes each Related Employer." (Exhibit B.)

37. Section 5(a) of the Award Agreement provided that "[f]or the two (2) years immediately following the termination of my employment for any reason, I agree to the following: (a) I will not accept employment with, be retained as a consultant by, perform services for, or receive any consideration, financial or otherwise, from a business that competes with the Plan Sponsor in the United States or Canada." (*Id.*)

38. On August 31, 2026, Halperns' terminated Hoffman's employment.

39. Toward the end of October 2026, Halperns' learned that Hoffman had accepted a position as General Manager of Stock Yards Collective ("Stock Yards"), a US Foods company, based out of their Houston, Texas, location.

40. US Foods is one of the competitors specifically identified in Section 6(b) of the Protective Agreement.

41. Stock Yards is based in Illinois, with locations across the U.S., including Houston, Texas.

42. Stock Yards is also a direct competitor of Halperns' in the protein processing and distribution industry and targets the same customers as Halperns'.

43. The confidential information that Hoffman acquired as Halperns' General Manager of the Texas Division and as Vice President of Operations would be extremely valuable to a competitor such as Stock Yards. It reveals Halperns' operational and competitive strategies, internal processes, cost structure, pricing and margins, resource allocation, vendor and procurement strategy, and business plans. With this information, Stock Yards could, among other things, anticipate and counter Halperns' strategic initiatives, replicate its operational practices, exploit known vulnerabilities, and make better-informed decisions about pricing, staffing, sourcing, investment, and expansion. Stock Yards could do all of this in the same Texas market where Hoffman operated for years and where he would be most effective.

44. As the General Manager of Stock Yards, Hoffman would be in the perfect role to act upon and use the confidential information he learned while at Halperns' to Halperns' detriment and for Stock Yards' benefit.

45. Therefore, by accepting this position at Stock Yards, Hoffman is not only violating his noncompete obligations under Section 6 of the Protective Agreement and Section 5(a) of the Award Agreement but also occupying a position where he could do the most harm and where he poses the greatest risk to Halperns'.

46. In fact, Hoffman's very presence at Stock Yards harms Halperns' because Halperns' has no way of knowing to what extent Hoffman may be considering, using, or disclosing its confidential and proprietary information for the benefit of this direct competitor. Such conduct seriously undermines Halperns' position in the market, which is why Halperns' required a noncompete in the Protective Agreement in the first place.

## COUNT I
## BREACH OF CONTRACT

47. Halperns' incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

48. The Protective Agreement constitutes a valid and binding contract between Halperns' and Hoffman.

49. Hoffman breached Section 6(a) of the Protective Agreement by working at Stock Yards in a role where his knowledge of Halperns' confidential and proprietary information could be helpful to Stock Yards, and where he will perform the same or similar responsibilities that he performed during his last two years of employment with Halperns', in the same geographic territory where he had managerial or supervisory responsibility.

50. Hoffman also breached Section 5(a) of the Award Agreement, which is incorporated into the Protective Agreement under Section 8, by accepting employment with a business that competes with Halperns' in the United States.

51. Halperns' has been harmed by these breaches because it will be forced to operate under the burden of unfair competition: its direct competitor, Stock Yards, employs a former executive with intimate knowledge of Halperns' most sensitive and proprietary confidential information, including information about its Annual Operating and Long Range Plans, business plans and strategies, financial results, pricing and margin strategies, pipelines and leads, customer identities, cost information, sales and delivery schedules, customer needs, expectations, and contracts, and vendor and supplier arrangements.

WHEREFORE, Halperns' requests that this honorable Court:

A. Grant injunctive relief prohibiting Hoffman from (a) working for Stock Yards or any other company in violation of Section 6(a) of the Protective Agreement and Section 5(a) of the Award Agreement, and (b) using or disclosing Halperns' confidential information.

B. Enter Judgment against Hoffman in favor of Halperns' in an amount to be determined, including without limitation all amounts paid to Hoffman under the LTIP pursuant to Section 6 of the Award Agreement.

C. Award Halperns' its costs and attorney fees.

D. Grant such other relief as the Court deems just and equitable, including exemplary damages.

**VERIFICATION**

I, Geordie Shaw, Senior Vice President of Halperns' Steak and Seafood Company, LLC verify, under the penalties of perjury, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Dated: November 17, 2026

HALPERNS' STEAK AND SEAFOOD COMPANY, LLC

By ____________________________

By: Geordie Shaw, Senior Vice President

WARNER NORCROSS + JUDD LLP

Dated: November 19, 2026

By /s/ Jarrod H. Trombley

Edward J. Bardelli
Jarrod H. Trombley
Samuel D. Hauke
Warner Norcross + Judd LLP
150 Ottawa Ave NW, Ste 1500
Grand Rapids, MI 49503
(616) 752-2000
Attorneys for Plaintiff